IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
COURT FILE NO.: 17-CV-1815 (SRN-SER)

| | |
|---|---|
| Charles Hrebal,<br><br>　　　　　Plaintiff,<br>v.<br><br>Seterus, Inc.,<br><br>　　　　　Defendant. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiff Charles Hrebal, (hereinafter "Plaintiff") commenced this action for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA") after Defendant Seterus, Inc., (hereinafter "Defendant") failed on three separate occasions to reasonably investigate and correct its erroneous reporting of debt that had been fully released and discharged in bankruptcy through the payment of arrearages in a confirmed Chapter 13 Bankruptcy payment plan. Defendant's dogged refusal to look beyond the face of its records and correct its inaccurate reporting after receiving multiple disputes, and its inconsistent and nonsensical responses to the credit bureaus, caused Plaintiff to suffer actual damages in the form of reduced credit, emotional distress, embarrassment, frustration, and anxiety constituting actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and § 1681n. By filing this motion, Plaintiff asks the Court to find that Defendant failed to perform reasonable investigations of his disputes in violation of 15 U.S.C. § 1681s-2(b), and that Defendant's violations of 15 U.S.C. § 1681s-2(b) were willful as a matter of law.

1

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I. Plaintiff opens a secured line of credit with CitiMortgage.**

In October of 2007, Plaintiff incurred a financial obligation with CitiMortgage, Inc. (hereinafter "CitiMortgage") when he obtained a line of credit secured by a mortgage on his home. (*ECF No. 1* – Complaint ("Compl.") ¶ 22.)[1]

**II.   Plaintiff files a Chapter 13 Bankruptcy Petition and Notifies CitiMortgage.**

On September 1, 2010, Plaintiff commenced a Chapter 13 bankruptcy, assigned Case Number: 10-46579 – RJK, and scheduled CitiMortgage as a secured creditor. (Compl. ¶ 25.) Notice of the bankruptcy filing was sent to CitiMortgage and was not returned by the post office. (Compl. ¶ 26.) On September 22, 2010, CitiMortgage filed a proof of claim in the amount of $6,152.37, notifying the Bankruptcy Court that Plaintiff was only two months behind in payments at the time of filing. (Compl. ¶ 27; *ECF No. 37*, pages 102-104; Exhibit D.) After filing the proof of claim, CitiMortgage later determined an amended proof of claim should be filed to include two additional payments that it omitted from the first filing, and repeatedly discussed the need to do so in its servicing notes. (*See* Declaration of Thomas J. Lyons Jr. ("Lyons Decl.") ¶ 3, Exhibit A – Deposition of Michael McNeal II ("McNeal II Dep.") 87:15 – 92:10.) CitiMortgage never filed an amended proof of claim.

Plaintiff's initial bankruptcy plan was confirmed on November 19, 2010, binding both Plaintiff and his creditors, including Defendant, to the plan and estopping creditors

---

[1] The Complaint referenced herein has been verified by Plaintiff.

from trying to collect anything outside the plan without seeking permission from the Bankruptcy Court and amending the existing plan.[2] On January 5, 2011, Plaintiff filed a motion to modify the initial Chapter 13 bankruptcy plan. On February 17, 2011 a hearing was held. The Amended Chapter 13 bankruptcy plan was confirmed by the Bankruptcy Court on March 18, 2011. (*See* Lyons Decl. ¶ 12, Exhibit J – Docket Report for Plaintiff's Chapter 13 Bankruptcy Petition #: 10-46579 ("Lyons Decl. ¶ 12, Exhibit J")).

### III. Defendant purchases the line of credit from CitiMortgage while Plaintiff's bankruptcy is pending.

On or about February 1, 2014, during Plaintiff's bankruptcy, CitiMortgage sold the line of credit to Defendant. (*ECF No. 37*, pages 183-197; Exhibit I – Deposition of Michael McNeal ("McNeal Dep.") 19:1-2.) CitiMortgage's account notes were made available to Defendant upon the sale. (McNeal II Dep. 92:25 – 93:8.) While Defendant's written policy requires an "initial and ongoing review" of all bankruptcies, including the proof of claim filed, this task was likely "overlooked" with respect to Plaintiff. (*ECF No. 37*, pages 124-166; Exhibit E – Deposition of Sequoia Watts ("Watts Dep.") 6:11 – 47:12; and Lyons Decl. ¶ 4, Exhibit B - Exhibit 13 attached to Sequoia Watts deposition, filed under seal)

On February 27, 2014, Defendant filed a Transfer of Claim Other Than for Security in Plaintiff's bankruptcy case, with a name and address for where future notices to Defendant should be sent. (Compl. ¶ 29; Lyons Decl. ¶ 12, Exhibit J). Defendant did not file an amended

---

[2] 11 U.S.C. §1327 states that "[t]he provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."

3

proof of claim or otherwise seek relief in bankruptcy court to preserve any interest it may have had in pre-petition payments not included on the proof of claim filed by CitiMortgage.

    **IV.**    **Plaintiff makes all his payments, completes the bankruptcy plan and receives a full discharge.**

In addition to making his monthly payments as required under the bankruptcy plan, Plaintiff also made his regular $3,000 monthly payment to Defendant. (McNeal Dep. 33:12 – 34:7.) Plaintiff received a full discharge on October 27, 2015. A copy of the discharge was sent to Defendant by first-class mail on October 29, 2015 and was not returned by the post office. (Compl. ¶¶ 30-31.)

    **V.**    **Defendant files false statements in bankruptcy court stating that Plaintiff failed to make payments.**

On or about November 19, 2015, Plaintiff received a letter from the bankruptcy court notifying him that Defendant claimed that he was two payments behind. (Compl. ¶ 32.) Specifically, Defendant reported that Plaintiff had failed to make post-petition payments in October and November 2015, which was false since Plaintiff had just completed making all payments due under his Chapter 13 plan, including the $6,152.37 listed in the proof of claim. (Compl. ¶ 33.) In addition, Plaintiff's bank statements showed he made both payments in full at the time they were due. (Compl. ¶ 35.)

    **VI.**    **Plaintiff first attempts to dispute Defendant's inaccurate reporting in or about March 2016.**

Plaintiff obtained a copy of his credit report and discovered that the national credit reporting agencies were inaccurately reporting his secured line of credit as 31-60 days late as of November 2015, which was impossible as he had just completed his 60-month Chapter 13

bankruptcy and never missed a payment. (Compl. ¶ 36.) So, on March 1, 2016, Plaintiff called Defendant to dispute its reporting but, contrary to Defendant's policy, Defendant took no action and instead told Plaintiff to put his dispute in writing. (Watts Dep. 84:24 – 87:10.) Plaintiff then initiated disputes with each of the three national credit reporting agencies requesting that the inaccurate status of 31-60 days late be deleted. (Compl. ¶ 37.)

### VII. Defendant fails to conduct a reasonable investigation of Plaintiff's March 1, 2016 dispute.

On March 1, 2016, Experian forwarded Plaintiff's dispute to Defendant for investigation via an Automated Consumer Dispute Verification ("ACDV"). (Watts Dep. 89: 16-18.) The ACDV reported the dispute as "Code 106" and further stated that Plaintiff "Disputes present previous account status, payment history, profile payment rating, verify payment history profile, account status and payment rating." (Watts Dep. 90:2-12; Lyons Decl. ¶ 5, Exhibit C – Exhibit 5, attached to Sequoia Watts deposition ("Lyons Decl. ¶ 5, Exhibit C").) Experian provided additional information in the FCRA Relevant information field that Plaintiff had included as part of his dispute: "I was never late. I have proof that I always paid on time and also this account should be included in my Chapter 13 bankruptcy." (Watts Dep. 90:22 – 91:10; Lyons Decl. ¶ 5, Exhibit C.)

Defendant's Credit Bureau Specialist, Sequoia Watts, who testified she handles about 35 disputes a day,[3] processed this first ACDV. (Watts Dep. 9:6; 23:24 – 24:2; 89:8 – 23; Lyons Decl. ¶ 5, Exhibit C.) Her process consisted of looking at Defendant's system of record

---

[3] This amounts to about four to five disputes per hour over the course of a regular eight-hour workday, not including time for breaks or other job duties, or 175 disputes per regular work week.

to see what the account was currently "reporting as", reviewing the payment history profile, and then checking bankruptcy records to see if the loan had been discharged. (Watts Dep. 91:16 – 92:15.) While Ms. Watts had access to CitiMortgage's servicing notes, she did not recall reviewing those notes as part of her investigation and testified that it is uncommon for anyone to review those notes in connection with processing credit disputes. (Watts Dep. 40:10-17; 44:11 – 45:15.) Ms. Watts then responded to the ACDV by suppressing the payment history for the period of April 2014 through October 2015 based on Defendant's bankruptcy-reporting protocol, updated the loan from 30 days past due to 60 days past due, and updated the first date of delinquency to March 3, 2016. (Watts Dep. 92:16 – 93:19.) She did not update the account to report it as "disputed" by using the compliance condition code field since she has never been trained on how to use that field and it is not used by Defendant. (Watts Dep. 75:20 – 76:12; 99:6 – 16.) Ms. Watts admitted she made a mistake in responding to Plaintiff's dispute on March 23, 2016. (Watts Dep. 99:25 – 100:14.)

    **VIII.   Plaintiff calls Defendant again to directly dispute Defendant's inaccurate reporting after it failed to conduct a reasonable investigation of his dispute.**

On March 25, 2016, Plaintiff called Defendant to dispute the continued late-payment reporting that Defendant failed to correct after processing the first ACDV. (Watts Dep. 105:25 – 106:1; Lyons Decl. ¶ 6, Exhibit D, filed under seal - Exhibit 23 attached to McNeal II Dep. ("Lyons Decl. ¶ 6, Exhibit D").) Defendant's representative who spoke to Plaintiff sent an email to its Credit Bureau Department, which was received by Ms. Watts, the same representative who had processed the March 1, 2016 ACDV. (Watts Dep. 106:1 – 109:1.) Ms. Watts responded that same day by sending an Automated Universal Data form ("AUD")

6

to the credit reporting agencies, including Experian, and therein updated the date of delinquency to December 1, 2013, changed the status to 30 days late rather than 60 days late, and suppressed all prior payment history from September 1, 2010 through October 27, 2015. (Watts Dep. 109:7 – 110:3; 112:1-6; 115: 4-25; Lyons Decl. ¶ 7, Exhibit E – Exhibit 6, attached to Sequoia Watts deposition.) Changing the date of delinquency to December 1, 2013 made it appear Plaintiff had been delinquent for the last three years rather than the last 30 days as Ms. Watts had reported a few days earlier. (Watts Dep. 113:11 – 114:3.)

> IX. **Defendant fails to conduct a reasonable investigation of Plaintiff's March 14, 2016 dispute.**

On March 14, 2016, Experian sent another ACDV to Defendant, again identifying Plaintiff's dispute as a "Code 106" and that Plaintiff "Disputes present previous account status, payment history, profile payment rating, verify payment history profile, account status and payment rating." (Watts Dep. 117:6; 118:14 – 119:1; Lyons Decl. ¶ 8, Exhibit F – Exhibit 7, attached to Sequoia Watts deposition ("Lyons Decl. ¶ 8, Exhibit F").) This time, however, Experian attached documents to the ACDV for Defendant to review as part of its investigation. (Watts Dep. 117:14-22.)

Ms. Watts processed the March 14th ACDV on March 29, 2016 in the same manner as she processed the March 1st ACDV despite the additional information provided. (Watts Dep. 117:6-10; Lyons Decl. ¶ 8, Exhibit F.) This time, though, she responded by updating the loan as due for February 1, 2016 (rather than March 3, 2016) and as 30 days past due. She then changed the date of the first delinquency back to March 3, 2016. (Watts Dep. 115:5-18; 119:2-

7

10.) She again failed to update the compliance code condition field to report the account as "disputed" by Plaintiff. (Watts Dep. 119:15-17.)

### X. Defendant fails to conduct a reasonable investigation of Plaintiff's March 25, 2016.

On March 25, 2016, Defendant received the third ACDV from Equifax. Therein, Equifax characterized Plaintiff's dispute as a "Code 007" and stated "Disputes present/previous account status/payment rating/account history, verify account status, payment rating, and account history." (McNeal II Dep. 76:8 – 77:5; *ECF 37*, pages 201-203; Exhibit K – Equifax ACDV created March 25, 2016 ("Tsai Exhibit K").) On April 14, 2016, Defendant's agent, Jermaine Daniels, processed the Equifax ACDV. Mr. Daniels responded to the ACDV by updating the payment history (rather than suppressing it as Ms. Watts had done per Defendant's policy at the time) to reflect that Plaintiff had been 30 days late every month since October 2015 and reported the accout was currently 30 days late as of April 14th. (McNeal II Dep. 76:8 – 77:5; Tsai Exhibit K.) Mr. Daniels also did not update the compliance code condition field to update the account as "disputed" by Plaintiff. (Watts Dep. 128:1 – 34:13; Lyons Decl. ¶ 6, Exhibit D.)

### XI. Plaintiff continues to dispute Defendant's reporting of his loan as past due.

Plaintiff called Defendant again on April 19th and twice on April 21, 2016 to dispute Defendant's continued reporting of his account as past due despite his disputes through the credit bureaus. (Watts Dep. 135:21 – 136:20.)

As of January 31, 2017, only Plaintiff's Equifax credit report continued to reflect Defendant's inaccurate reporting. (Compl. ¶ 43.) Defendant was still reporting Plaintiff's

account as past due $2,916.00 and 30 days delinquent starting in November 2015. (Compl. ¶ 44.)

### XII. Defendant's repeated failure to conduct a reasonable investigation and correct the inaccurate reporting causes Plaintiff to incur actual damages.

Plaintiff's credit report following his Chapter 13 discharge was otherwise in satisfactory condition for him to obtain a loan to refinance the secured line of credit. (Lyons Decl. ¶ 9, Exhibit G – Declaration of Roger J. Fisette Jr. ("Fisette Decl.") ¶¶ 6-8.) In March 2016, Embrace Home Loans moved forward with its usual two-week process in anticipation of closing on the loan, which provided for a 4.375% interest rate, saving Plaintiff $800 on his then-current monthly payment. (Fisette Decl. ¶ 9.) All paperwork was finalized for the loan, and everything was prepared and had been accepted except for the payout. (Fisette Decl. ¶ 10.) But on April 18, 2016, Plaintiff's March 2016 mortgage payment was reported by Defendant as 48 days late. (Fisette Decl. ¶ 11.) Embrace Home Loan's broker attempted to work with Plaintiff to address the discrepancy by calling Defendant and CitiMortgage on his behalf, but the late-payment reporting continued. (Fisette Decl. ¶¶12-13.) Embrace Home Loans had no choice but to deny Plaintiff the refinance loan because of the 48-day late payment reference. (Fisette Decl. ¶14.) Plaintiff was not able to refinance his loan until a year later, but with a higher interest rate resulting in less savings than he would have enjoyed but for Defendant's actions. (Fisette Decl. ¶¶ 15-20.)

Defendant's actions also had the natural consequence of causing Plaintiff emotional distress and mental anguish, which manifested itself in loss of sleep, anxiety and fear of foreclosure. (*ECF No. 37*, pages 4-42; Exhibit A - Hrebal Depo. ("Hrebal Dep.") 78:22 –

9

79:17; Lyons Decl. ¶ 10, Exhibit H – Declaration of Richard Scoles ("Scoles Decl.") ¶¶ 3-4.) He suffered from a short temper, compelling him on many occasions to mentally "snap" with his employees, his wife, and his children. (Hrebal Depo. 28:11-13; Scoles Decl. ¶ 5.) Plaintiff became distant and forgetful, and his relationship with his friends and his wife suffered as a result. (Scoles Decl. ¶¶ 2 – 5.) Plaintiff was greatly embarrassed when his new employer pulled his credit and he was forced to explain that he was not behind on his mortgage, and that his credit was negatively impacted by Defendant's inaccurate credit reporting. (Hrebal Depo. 26:12 – 27:12.; See also Lyons Decl. ¶ 11, Exhibit I – Declaration of Christina Hrebal).

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When a motion for summary judgment is properly made and supported, the adverse party may not rest upon the allegations or denials in its pleading but must instead set forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Johnson v. Hamilton*, 452 F.3d 967, 972 (8th Cir.2006); *Thompson v. Hubbard*, 257 F.3d 896, 898–99 (8th Cir.2001).

## ARGUMENT

**I. SUMMARY JUDGMENT ON FCRA LIABILITY IS WARRANTED BECAUSE DEFENDANT FAILED TO CONDUCT A RESONABLE INVESTIGATION AS A MATTER OF LAW.**

Congress enacted the Fair Credit Reporting Act ("FCRA"), "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47,127 S.Ct. 2201, 2205, 167 L. Ed. 2d 1045 (2007). To ensure that credit reports are accurate, the FCRA imposes duties on "furnishers", the sources that provide information to the credit reporting agencies ("CRAs"). Section 1681s-2 sets forth two categories of duties on furnishers like Respondent.

The first category, Subsection (a), details the duty "to provide accurate information," and specifically includes the following:

> (3) Duty to provide notice of dispute. If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

15 U.S.C. § 1681s-2(a)(3). The duty to provide accurate and complete information, including notice of a dispute, is constant. Once the furnisher is notified by the consumer through any means that the account information is disputed, the furnisher <u>must</u> include notice of that dispute any time it reports information about the account to the CRAs. This first category is enforceable by state and federal agencies.

Plaintiff asserts that Defendant violated the "investigation" duties contained in the second category, set forth in 15 U.S.C. § 1681s-2(b)(1), when it failed to conduct a

11

reasonable investigation of his late-payment disputes. Upon receipt of a consumer dispute from a CRA,[4] the furnisher must:

> (1) investigate the disputed information;
> (2) review all relevant information provided by the CRA;
> (3) report the results of the investigation to the CRA;
> (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and
> (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable.

15 U.S.C. § 1681s-2(b). Accordingly, furnishers are required to determine whether the information that they previously reported to a CRA is "incomplete or inaccurate." If a furnisher fails to comply with their obligations under § 1681s-2(b), the FCRA authorizes a consumer to assert a private cause of action.

The reasonableness of furnisher's investigation is reasonable is usually a question reserved for the jury, but summary judgment is appropriate where the reasonableness of a defendant's procedures is "beyond question." *See Olwell v. Medical Information Bureau*, 2003 WL 79035 *3 (D.Minn. 2003), *citing Crabill v. Trans Union*, 259 F.3d 662, 664 (7th Cir. 2001); *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 ("summary judgment is proper if the reasonableness of the defendant's procedures is beyond question").

### A. The undisputed facts show that Defendant performed only cursory reviews of its inaccurate records rather than true "investigations" as required by 15 U.S.C. § 1681s-2(b).

Each time Defendant received notice of Plaintiff's dispute from the credit bureaus, it was required to "conduct a reasonable investigation of [its] records to determine whether

---

[4] 15 U.S.C. § 1681i(a)(2) requires CRAs promptly to provide such notification containing all relevant information about the consumer's dispute to the furnisher of information.

the disputed information [could] be verified." *Schaffhausen v. Bank of America, N.A.*, 393 F.Supp.2d 853, (D.Minn. 2005), *citing Johnson v. MBNA Bank of America, NA*, 357 F.3d 426, 431; *Malm v. Household Bank,* 2004 WL 1559370, at *4 (D.Minn. July 7, 2004). A reasonable investigation "requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute." *Gorman v. Wolpoff & Abramson*; 552 F.3d 1008, 1015 (9th Cir. 2010). "Rubber stamping" their prior reporting is not sufficient. *Id*. As stated by the Fourth Circuit:

> the plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors. Further, § 1681s-2(b)(1)(A) uses the term "investigation" in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute-and, ultimately, correct inaccurate information on their credit reports, Congress used the term "investigation" to include superficial, unreasonable inquiries by creditors.

*Johnson v. MBNA Bank of America, NA*, 357 F.3d 426, 430-31; s*ee also Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012); *Gorman* at 1163.

Summary judgment is warranted here because Defendant's limited and cursory review of its computer system is the type of investigation that has been flatly and repeatedly rejected as "reasonable" under the FRCA. Defendant's representative Sequoia Watts, who has been employed by Defendant for 14 years and is one of two people who specifically handles bankruptcy-related credit disputes, processed two of Plaintiff's disputes and an AUD. Ms. Watts testified about her process in handling these disputes and admitted she never went beyond double-checking the usual computer screens to verify the information

13

currently being reported to the CRAs matched what was appearing in Defendant's system of record. She did not look beyond the surface, follow the verification instructions provided in the ACDV, or do anything that would have been likely to uncover the source of the discrepancy in the post-discharge payment history Defendant was reporting.

Although Defendant was armed with a treasure trove of information, including the prior servicer's account notes that clearly revealed an issue with the proof of claim, as well as its own account notes dating back to February 2014, Defendant's agents never reviewed this information. Each of Plaintiff's disputes was handled in the same summary fashion that involved comparing the points of data provided by the CRA with Defendant's own records. *See Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611 (6th Cir. 2012) (finding that a "cursory confirmation" of a creditor's own records is insufficient and that a reasonable investigation required that the creditor "review the relevant, underlying documentation"). Had Defendant conducted a reasonable investigation of Plaintiff's disputes as it finally did after this lawsuit was filed, the discrepancies in the payment history it was reporting would have been uncovered.

The unreasonableness of Defendant's investigations is further supported by its inconsistent and nonsensical responses to the ACDVs. *See Johnson v. Collecto, Inc.*, 127 F.Supp.3d 1012, 1018 (D.Minn. 2015), citing *Schaffhausen*, 393 F.Supp.2d at 859 (stating that the furnisher's "convoluted and inconsistent responses to the CRAs inquiries show that its investigation procedures were unreasonable.") Each time Defendant responded to an ACDV, it materially altered its previous response in such a way that demonstrated a

complete lack of care and precision when it came to accurately and completely reporting Plaintiff's true payment history:

- On March 23, 2016, Sequoia Watts responded to an Experian ACDV by suppressing the payment history for the period of April 2014 through October 2015 per Defendant's bankruptcy-reporting protocol, updated the loan from 30 days past due to 60 days past due, and updated the first date of delinquency to March 3, 2016.

- On March 25, 2016, Sequoia Watts sent an AUD[5] to the credit reporting agencies and therein updated the first date of delinquency to December 1, 2013, changed the current status to 30 rather than 60 days late, and suppressed all prior payment history from September 1, 2010 through October 27, 2015.

- On March 29, 2016, Sequoia Watts responded to another Experian ACDV by updating the loan as currently due for February 1, 2016 and 30 days past due, and changed the first date of delinquency back to March 3, 2016.

- on April 14, 2016, Jermaine Daniels responded to an Equifax ACDV by updating the payment history (rather than suppressing like Ms. Watts had) to reflect that Plaintiff was currently 30 days past due had been 30 days late every month since October 2015, but left the first date of delinquency as March 3, 2016 (which contradicts the payment history he had updated to show Plaintiff

---

[5] This response by Defendant is not actionable per se under §1681s-2(b) because it was sent in response to a direct dispute but provides context and shows the pattern of inconsistency and refusal to look beyond Defendant's initial computer screens.

had been consistently delinquent in his payments since he was discharged in bankruptcy).

The only consistency was Defendant's failure to update the compliance condition code field to report the account as "disputed."

Defendant never bothered to determine which payment(s), if any, had been missed before, during, or after the bankruptcy so that it could, at the very least, get the date of delinquency correct. Defendant's ever-changing responses to the same dispute, specifically with respect to the first date of delinquency and the month-by-month payment history show that Defendant had no clue as to how or when Plaintiff's account supposedly became delinquent, and that it had no intention of going beyond its initial screens to figure it out. *See also Watson v. Citi Corp.*, 2008 WL 4186317, at *4 (S.D. Ohio Sept. 5, 2008) (evidence that furnisher should have known from prior disputes and consumer's telephone complaints that the prior servicer had reached a compromise settlement of the account raised questions of material fact whether furnisher's investigation was reasonable), *later op.*, *Watson v. Citi Corp.*, 2009 WL 161222 (S.D. Ohio Jan. 22, 2009) (finding at bench trial that credit card company did not conduct a reasonable investigation when it failed to contact its collection agency to verify or refute consumer's claim that agency had compromised and settled debt and instead "merely relied on its own incomplete records"). For these reasons, summary judgment on the reasonableness of Defendant's investigations should be granted.

### B. Defendant Did Not Provide Notice of Plaintiff's Dispute.

A furnisher is required, upon receiving notice of a dispute, to report the results and "if the investigation finds that the information is incomplete or inaccurate, report those

results." 1681s-2(b)(1)(C), (D). Here, there is no dispute that Defendant reported Plaintiff's account without including notice that the payment history was disputed and failed to cure this omission or "inaccuracy" time and again after its purported investigations of Plaintiff's disputes. *Gorman* at 1002, *citing Saunders v. Branch Banking Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008) (stating that "Congress clearly intended furnishers to review reports not only for inaccuracies in the information but also for omissions that render the reported information misleading" and omitting "the disputed nature of the debt could render the information sufficiently misleading so as to be "incomplete or inaccurate").

There can be little to no argument that Defendant's dispute was bona fide or at the very least "potentially meritorious." The undisputed facts prove that the inaccurately-reported payment history stem from an error committed by Defendant and its predecessor during Plaintiff's bankruptcy. Defendant was aware of the continuing dispute over the status of Plaintiff's account and had an obligation to provide such notice to the CRAs and Plaintiff's current and prospective creditors. Without noting Plaintiff's continuing dispute of the accuracy of the reporting, Defendant created a materially misleading impression to the credit reporting agencies and users of Plaintiff's credit report, in violation of 1681s-2(b). *Seamans v. Temple University*, 744 F.3d 853, 867 (3rd Cir. 2014) (holding that the furnisher's failure to report the consumer's "potentially meritorious" dispute may constitute a "material inaccuracy" and vacating the district court's order granting summary judgment on the consumer's Section 1681s-2(b) claims); *Boggio*, 696 F.3d at 617 (holding that a furnisher violates Section 1681s-2(b)(1)(D) when it fails to identify that a consumer disputes his information); *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1186

17

(relying on *Boggio* and *Saunders* in denying the furnisher's motion for summary judgment).

## II. DEFENDANT'S FCRA VIOLATIONS WERE WILLFUL AS A MATTER OF LAW.

A data furnisher can be held liable for punitive damages if it is determined that it willfully failed to comply with any portion of the FCRA. 15 U.S.C § 1681n. In *Safeco Insurance Co. of America v. Burr*, the Supreme Court held that "willfulness" included not only knowing violations, but also those which are reckless or committed with reckless disregard of the law. 551 U.S. 47, 57 (2007). While the *Safeco* Court ultimately concluded that the defendants had not acted willfully because their conduct was based upon an objectively reasonable reading of the FCRA at the time, the same cannot be said of Defendant in this case. 551 U.S. at 69-70. Although the issue of willfulness is generally a question of fact for the jury, the Court may determine willfulness as a matter of law if it concludes that there is no genuine issue of material fact that Defendant's conduct created "a risk [of an FCRA violation] substantially greater than that which is necessary to make [its] conduct negligent. *See Guimond v. Trans Union Credit Information*, 45 F.3d 1329 (9th Cir. 1995) ("The reasonableness of [a defendant's] procedures…will be jury questions in the overwhelming majority of cases."); *Safeco*, 127 S.Ct. at 2215. This is one of those rare and exceptional cases.

Defendant's conduct cannot be described as a mistake or mere negligence. Defendant was repeatedly put on notice in a variety of ways through direct disputes and ACDVs from the CRAs that there was a discrepancy between the bankruptcy records and Defendant's accounting of Plaintiff's payment history. While Defendant's onboarding requirements for

transferred purchased loans required a review of the prior history and the proof of claim, Defendant could not have performed more than a cursory review at that time, if any, because had Defendant taken the time to do so it would have been obvious that CitiMortgage had committed an oversight in the process of filing the proof of claim. Defendant had access to all the information it needed to uncover the cause of the discrepancy and correct the reporting long before Plaintiff even disputed, but never bothered to consider it.

Moreover, Defendant received a copy of Plaintiff's discharge order – once from the bankruptcy court and as an attachment to a dispute – which completely absolved Plaintiff of any old arrearages or liability outside of what was listed in the proof of claim, yet Defendant purposely continued to seek collection of discharged debt by mischaracterizing it as occurring after the bankruptcy was completed.

Defendant made a conscious decision again and again by choosing to do a cursory review and not consult any underlying documents or prior servicer notes until after this lawsuit was filed. Processing ACDVs, like those sent in connection with Plaintiff's disputes, was committed intentionally with a reckless disregard and knowing misconduct. To make matters worse, Defendant never updated its reporting to provide notice that the account status was disputed because Defendant does not train its agents to use the compliance condition code field. Such a lackadaisical approach to credit-reporting disputes in spite of Defendant's knowledge of the FCRA and its statutory duties entitles Plaintiff to summary judgment in his favor on the issue of willfulness and punitive damages.

## **CONCLUSION**

For all of the above reasons, Plaintiff respectfully requests that the Court determine

Defendant violated 15 U.S.C. § 1681s-2(b) by failing to reasonably investigate each of his disputes and that Defendant's actions were willful and committed with reckless disregard of the law entitling Plaintiff to pursue an award of punitive damages at trial.

Dated this 11th day of July, 2018.

By: s/Thomas J. Lyons Jr.
Thomas J. Lyons, Jr., Esq.
Attorney I.D. #: 0249646
CONSUMER JUSTICE CENTER P.A.
367 Commerce Ct.
Vadnais Heights, MN 55127
Telephone: (651)770-9707
Facsimile: (651)704-0907
tommy@consumerjusticecenter.com

Mark L. Vavreck, Esq.
Attorney I.D. #318619
GONKO & VAVRECK PLLC
Designers Guild Building
401 North Third Street, Suite 600
Minneapolis, MN 55401
Telephone: 612-659-9500
Facsimile: 612-659-9220
mvavreck@cgmvlaw.com

*Attorneys for Plaintiff*