## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Charles Hrebal, | Case No. 17-cv-1815 (SRN/SER) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Seterus, Inc., | |
| Defendant. | |

Mark L. Vavreck, Gonko & Vavreck PLLC, 401 North Third Street, Suite 600, Minneapolis, MN 55401 and Thomas J. Lyons, Jr., Consumer Justice Center PA, 367 Commerce Court, Vadnais Heights, MN 55127 for Plaintiff.

Ernest P. Wagner, Maurice Wutscher LLP, 105 West Madison Street, Suite 1800, Chicago, IL 60602; Eric Tsai, Maurice Wutscher LLP, 71 Stevenson Street, Suite 400, San Francisco, CA 94105; and Andrea M. Hauser, Eldon J. Spencer, Jr. & Paul Shapiro, Leonard, O'Brien, Spencer, Gale & Sayre Ltd., 100 South Fifth Street, Suite 2500, Minneapolis, MN 55402 for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This litigation arises under the Fair Credit Reporting Act ("FCRA"). In essence, the parties dispute whether Defendant Seterus, Inc. ("Seterus") provided "inaccurate" or "materially misleading" information to the three major credit reporting agencies ("CRAs") in 2016, when Seterus reported Plaintiff Charles Hrebal ("Hrebal") as delinquent on his mortgage, shortly after Hrebal successfully completed a Chapter 13 bankruptcy plan. The parties also dispute whether Seterus's FCRA violations (if any) were willful, as well as

whether Seterus's FCRA violations (again, if any) caused Hrebal to suffer actual damages. With discovery complete, both sides now move for summary judgment.

After carefully reviewing the record and applicable case law, the Court grants in part and denies in part Seterus's motion, and denies Hrebal's motion.

## I.   BACKGROUND

### A.  The Parties

Plaintiff Charles Hrebal lives in Annandale, Minnesota with his wife, Christina, and three of his four children. (*See* Tsai Dec., Ex. A [Doc. No. 37] at 9 ("Charles Hrebal Deposition"); Lyons Dec., Ex. I [Doc. No. 44-7] ¶ 8 ("Christina Hrebal Declaration").) Hrebal works in car sales. (*See* Hrebal Dep. at 9-10.) In October 2007, Hrebal took out a mortgage loan from CitiMortgage, Inc. (*See* Compl. [Doc. No. 1] ¶ 22]; An. [Doc. No. 7] ¶ 22; *see also* McNeil Aff., Exs. A-B [Doc. No. 36] ("Original Note and Mortgage").)

Defendant Seterus, Inc. is a national loan servicing company. (*See* Compl. [Doc. No. 1] ¶ 5; An. [Doc. No. 7] ¶ 5.) Seterus has serviced Hrebal's home mortgage loan since February 1, 2014, when the Federal National Mortgage Association ("Fannie Mae") purchased Hrebal's loan from CitiMortgage, and contracted with Seterus to service Hrebal's loan on its behalf. (*See* McNeil Aff. [Doc. No. 36] ¶ 4.)

### A.  The Chapter 13 Bankruptcy

In 2010, Hrebal's car dealership began experiencing financial difficulties. (*See* Hrebal Dep. at 33.) As such, on September 1, 2010, he filed for Chapter 13 bankruptcy. (*See* Tsai Dec., Ex. B [Doc. No. 37] ("Chap. 13 Petition"); *see generally* Lyons Dec., Ex. J [Doc. No. 44-8] ("Bankruptcy Case Docket").) At the time Hrebal filed for bankruptcy, he was four

payments behind on his home mortgage, which was then owned by CitiMortgage. (*See* McNeil Aff., Ex. C [Doc. No. 36] at ECF p. 39 ("CitiMortgage Payment History").) Consequently, Hrebal's initial Chapter 13 plan, dated August 27, 2010, stated that Hrebal owed CitiMortgage $10,200 in arrears (*i.e.*, four months' worth of payments), and set forth a plan to repay that debt. (*See* Tsai Dec., Ex. C [Doc. No. 37] ("First Chapter 13 Plan").)

However, for unclear reasons, on September 22, 2010 CitiMortgage filed a Proof of Claim stating that Hrebal only owed it $6,152.37 in pre-petition arrears (*i.e.*, two months' worth of payments). (*See* Tsai Dec., Ex. D [Doc. No. 37] ("CitiMortgage Proof of Claim").)[1] A few months later, on January 5, 2011, Hrebal filed an amended Chapter 13 plan reflecting this (lower) arrearage. (*See* Tsai Dec., Ex. F [Doc. No. 37] ("Am. Chapter 13 Plan"); Bankruptcy Docket, No. 23.) CitiMortgage did not object to this plan, and, on March 18, 2011, the Bankruptcy Court approved Hrebal's amended plan following a hearing. (*See* Tsai Dec., Ex. G [Doc. No. 37] ("Order Confirming Modified Post-Confirmation Chapter 13 Plan").)

The relevant portion of Hreabl's final confirmed plan stated that Hrebal would cure "the actual amounts of default" by gradually paying $6,152.37 to the Trustee, who in turn would pay CitiMortgage. (Am. Chapter 13 Plan § 6.) The plan also stated that Hrebal would "pay the [mortgage] payments that come due after the date the petition was filed directly to the creditor." (Am. Chapter 13 Plan § 6; *accord* 11 U.S.C. § 1322(b)(5) (allowing an

---

[1]     This error may have arisen because, although Hrebal tendered his June and July 2010 payments on August 31, 2010 (just prior to the bankruptcy), CitiMortgage's payment records show that, on September 8, 2010, CitiMortgage reversed those two payments. (*See* CitiMortgage Payment History at ECF p. 39.)

individual who owes arrears on their home mortgage to create a Chapter 13 plan that "provide[s] for the curing of any default within a reasonable time *and* maintenance of payments while the case is pending").) It is undisputed that, from October 2010 onwards, Hrebal timely made both his plan payments and his regular mortgage payments. (*See* Tsai Dec., Ex. I [Doc. No. 37] at 33-34 ("Michael McNeil Deposition I").)

According to internal CitiMortgage servicing records produced in discovery, sometime around January 2012, CitiMortgage realized that its Proof of Claim was incorrect. (*See* Lyons Aff., Ex. D [Doc. No. 47] at ECF pp. 2-3 ("Servicing Notes").) However, despite dozens of internal notes from 2012 through 2014 suggesting that CitiMortgage should file an amended Proof of Claim, including a note stating that an amended Proof of Claim had been sent out "for filing" (*see id*. at 2), CitiMortgage never in fact amended its Proof of Claim. (*See* McNeil Dep. I at 22-25 (confirming these facts); Lyons Dec., Ex. A [Doc. No. 44-1] at 88-105 ("Michael McNeil Deposition II") (providing further detail).) Moreover, it seems that, because the Trustee had already paid off the arrears detailed in CitiMortgage's Proof of Claim when CitiMortgage sold Hrebal's loan to Fannie Mae/Seterus in February 2014, Seterus did not investigate this issue any further during the bankruptcy proceeding. (*See* McNeil Dep. I at 41-45; *see also* Tsai Dec., Ex. H [Doc. No. 37] ("Trustee Payment History") (showing that the Trustee had paid CitiMortgage its entire $6,152.37 Proof of Claim by December 27, 2011).) Rather, Seterus continued to accept Hrebal's normal monthly mortgage payments without filing an amended Proof of Claim or otherwise notifying the Bankruptcy Court or Trustee about the missing arrears. (*Id*.) Indeed, when Hrebal called to inquire about his mortgage's status during this time period, Seterus appeared to inform him that he was "current

on all payments." (*See* Servicing Notes at ECF p. 93 (noting, in response to a call from Hrebal, that there were "no missing payments" on Hrebal's account); *see also* C. Hrebal Dec. ¶ 4 (stating that, when Hrebal called Seterus during the bankruptcy, they told him "your account is current"); Hrebal Dep. at 15 (similarly noting that, the first "couple times" he called Seterus, "they said I was fine and there wasn't anything wrong").)

On October 27, 2015, Hrebal successfully completed his modified Chapter 13 plan, and the Bankruptcy Court granted him a discharge under 11 U.S.C. § 727. (*See* Tsai Dec., Ex. J [Doc. No. 37] ("Bankruptcy Discharge").)

However, the issue of the "missing two payments" returned to the fore on November 3, 2015, when the Bankruptcy Trustee sent Fannie Mae/Seterus a Notice of Final Cure Payment. (*See* McNeil Aff., Ex. E [Doc. No. 36] ("Notice of Final Cure").) The notice stated that, in the Trustee's view, Hrebal had "paid in full the amount required to cure the default under [CitiMortgage/Fannie Mae's] claim" and requested a response confirming or denying this fact, as well as inquiring if Hrebal was behind on his "post-petition" payments. (*Id.*; *see also* Fed. R. Bankr. P. 3002.1(f) (requiring this notice for claims "secured by a security interest in the debtor's principal residence").)

Fannie Mae/Seterus timely responded, and asserted (seemingly for the first time) that, although Hrebal had "paid in full the amount required to cure the default [prior to the bankruptcy]," "as of November 17, 2015 . . . [Hrebal] was [not] current on all *post-petition* payments, fees, expenses, and charges." (McNeil Aff., Ex. F [Doc. No. 36] ("Response to Notice of Final Cure") (emphasis added); *see also* Fed. R. Bankr. P. 3002.1(g) (requiring the creditor to file a statement "itemiz[ing] the required cure or postpetition amounts, if any, that

the holder contends remain unpaid as of the date of the statement").) In particular, Fannie Mae/Seterus claimed that Hrebal was "past due" on his mortgage payments for October 2015 and November 2015. (*Id.*)

Because Hrebal knew he had made his mortgage payments for these months (just as he had made all of his required mortgage payments since filing the Chapter 13 petition back in September of 2010), Hrebal (and, apparently, his bankruptcy attorney) assumed Fannie Mae/Seterus was mistaken. (*See* Hrebal Dep. at 35-37.) Consequently, Hrebal did not follow up on this letter. (*Id.* at 35-37; *cf.* Fed. R. Bankr. P. 3002.1(h) (allowing debtor to request a "hearing" after receiving a response to a notice of final care, to "determine whether the debtor has cured the default and paid all required postpetition amounts").)

Seterus viewed the situation differently. As its corporate witness, Michael McNeil, testified, "even though [Hrebal] made every monthly payment [after entering bankruptcy], [because] there was two outstanding payments [from before the bankruptcy], it [made] [Hrebal] still outstanding at the end because it wasn't included in [the] bankruptcy like it should have been." (McNeil Dep. I at 35.) Although "if everything [had been] done right, [Hrebal] should have been current coming out of the bankruptcy," McNeil asserted, the erroneous Proof of Claim resulted in Hrebal "walk[ing] out of bankruptcy still two payments behind." (*Id.* at 36.) Moreover, Seterus was apparently treating these missing pre-petition payments as part of Hrebal's ongoing mortgage balance (*i.e.*, late in October and November 2015), rather than as uncured pre-petition arrears (*i.e.*, late in August and September 2010), because, in McNeil's words, "when you make a payment . . . and the loan is delinquent, it's going to go to the prior month payment." (*Id.* at 37; *accord* Tsai Dec., Ex. E [Doc. No. 37] at

97-98, 143-45 ("Sequoia Watts Deposition"); McNeil Aff., Ex. B [Doc. No. 36] at 4 § 2 ("Hrebal Mortgage") (stating that payments will be applied "in the order in which [they] become due").) Therefore, in Seterus's view (as evidenced by its internal payment records), Hrebal had been continuously "two months behind" on his mortgage since Seterus began servicing his loan in 2014, even as Hrebal timely made his usual monthly mortgage payments; Seterus simply refrained from enforcing these two back payments while Hrebal was still in bankruptcy. (*Id.*; *see also* McNeil Aff., Ex. D [Doc. No. 36] ("Hrebal Payment Records") (showing how Hrebal's "regular payments" were applied to months prior to the month in which Hrebal paid).)[2]

## B. The Post-Bankruptcy Credit Reports

The situation worsened when Hrebal began checking his credit reports in early 2016. Hrebal discovered that Seterus was informing the three major CRAs (*i.e.*, Experian, Equifax, TransUnion) that he was delinquent on his mortgage, even though, in his view, he had been making timely payments for over five years and had just (successfully) emerged from bankruptcy. As Hrebal explained it, "I just knew that this wasn't right . . . and I had to get this taken care of. Those payments were wrong, and it wasn't my fault." (Hrebal Dep. at 15.)[3]

---

[2]    The Court reiterates that, although the payment records appear to support Seterus's narrative (*i.e.*, that the company believed Hrebal was "behind" on his mortgage since the day it began servicing his loan), Seterus's employees seemingly told Hrebal otherwise during the preceding months. (*Compare supra* at 4-5 *with* Hrebal Payment Records.)

[3]    Although the record does not indicate when exactly Seterus began reporting Hrebal as delinquent on his mortgage to the CRAs, Seterus's internal servicing notes show that, at the least, Seterus submitted an Automated Universal Dataform ("AUD") to the CRAs on December 10, 2015, in which Seterus stated that Hrebal was "30 days past due" on his mortgage, as of "November 1, 2015." (Servicing Notes at ECF p. 119; *see*

Accordingly, on March 1, 2016, Hrebal called Seterus to dispute the delinquency. (*See* Servicing Notes at ECF p. 120; *accord* Hrebal Dep. at 15; Watts Dep. at 85-87.) The Seterus representative told Hrebal to send his dispute in writing to the CRAs, which Hrebal appeared to do that day. (*Id*.) Thus, on March 1, Seterus received an Automated Credit Dispute Verification ("ACDV")[4] from Experian, containing the following message from Hrebal: "I was never late. I have proof that I always paid on time and also this account should be included in my Chapter 13 bankruptcy." (*See* McNeil Aff., Ex. G [Doc. No. 36] ("Response to March 1, 2016 Experian ACDV").)

Seterus (through one of its "credit bureau specialists," Sequoia Watts) responded to Experian on March 23, 2016.[5] Watts reviewed Hrebal's "payment history profile," along with the discharge status of his bankruptcy, and determined that Hrebl was "60 days past due" as of March 23, 2016, with a "first date of delinquency" of March 3, 2016. (*See* Watts Dep. at 91-95.) This made it appear as though "Hrebal had brought his account current and then was now falling behind." (*Id*. at 98.) For unclear reasons, Watts also noted that Hrebal was "one month late" during September 2015, but not during any of the months between then and March 2015. (*See* Response to March 1, 2016 Experian ACDV.) At her deposition, Watts

---

*also* Watts Dep. at 67-82 (explaining this entry).) An AUD is an electronic means by which a financial entity can report consumer information to a CRA.

[4]     An ACDV is an electronic means by which a CRA may report a consumer dispute to a "furnisher" of consumer data, like Seterus. *See* 15 U.S.C. § 1681i(a)(2) (requiring CRAs to promptly report a "notice of a dispute from any consumer" to the "furnisher" of the at-issue information).

[5]     "Credit bureau specialists" like Watts handle approximately 35 credit disputes a day. (*See* Watts Dep. at 24.)

admitted that, because Seterus's policy is to suppress payment history during a bankruptcy (and because Hrebal did not receive his bankruptcy discharge until October 2015), this "September 2015 entry" was a "mistake." (*Id*. at 100; *see also id*. at 28-29, 94-105 (describing company policy with respect to bankruptcy reporting).) Notably, in responding to Experian, Watts did not inform the CRAs that Hrebal was disputing his delinquency, or otherwise confirm the legitimacy of Hrebal's dispute, even though there was a code that allowed her to do so. (*See* Watts Dep. at 75-76, 99, 134-35 (describing the "CCC" and "XB" codes).)[6]

Two days later, following a call from Hrebal, Watts issued an AUD removing the mistaken "September 2015 entry," and then changed the report to say that Hrebal was "30 days past due," as opposed to "60 days past due." Watts apparently made the latter change because she realized Hrebal had made a double payment at some point in time, and thus his outstanding balance was only "$2,916 due" (*i.e.*, one monthly payment). (*See* McNeil Aff., Ex. H [Doc. No. 36] ("March 25, 2016 AUD"); *see also* Watts Dep. at 138-41 (explaining Hrebal's payment history).)[7] For unclear reasons, and contrary to Watts's description of company policy, in this March 25, 2016 AUD Watts also changed Hrebal's "first date of delinquency" to "December 1, 2013," even though the rest of the AUD showed his

---

[6]    At her deposition, Watts explained that Seterus does not use that code when responding to ACDVs because "the [CRAs] have already been notified on their end that the consumer is disputing something." (*Id*. at 134, 149-50.)

[7]    The Court is not certain why Seterus's payment history showed Hrebal as one payment behind when the November 3, 2015 Notice Seterus sent to the Bankruptcy Court listed Hrebal as two payments behind. This is especially confusing because, according to Hrebal's payment history and Watts's deposition, Hrebal's "double payment" occurred sometime in December 2014, long before the bankruptcy discharge. (*See* Watts Dep. at 137-38.)

mortgage as "30 days past due" as of March 25, 2016. (*See* Watts Dep. at 110-14 (stating that she does not know why she changed this date).) At this point, Hrebal looked as if he had been one payment behind for over two years. (*Id.* at 113-14.)

On March 14, 2016, Seterus received a second ACDV from Experian. This ACDV appeared to contain a few documents that Hrebal sent to Experian alongside his dispute notification, such as a copy of his Chapter 13 discharge notice and a copy of CitiMortgage's transfer of claim to Fannie Mae. (*See* McNeil Aff., Ex. I [Doc. No. 36] ("Response to March 14, 2016 Experian ACDV").) Seterus (again, by way of Watts) responded to this ACDV on March 29, 2016. This response essentially re-affirmed Seterus's March 25, 2016 AUD (*i.e.*, stated that Hrebal was 30 days past due as of March 28, 2016), but changed Hrebal's "first date of delinquency" to again say "March 3, 2016." (*Id.*) Watts did not mark Hrebal's delinquency as disputed in this ACDV response either. (*See* Watts Dep. at 119.)

Finally, on March 25, 2016, Seterus received a third ACDV, this time from Equifax. The request simply stated: "Consumer states that this account was never late." (*See* Tsai Dec., Ex. K [Doc. No. 37] ("Response to March 25, 2016 Equifax ACDV").) This ACDV was handled by a credit bureau specialist named Jermaine Daniels. (*Id.*)[8] In Daniels's response, dated April 14, 2016, he stated that Hrebal was 30 days past due as of April 14, and that Hrebal's "first date of delinquency" was March 2016. (*Id.*) This response was essentially in accord with Watts's March 29, 2016 response to Experian. Yet, for unclear reasons, and contrary to Watts's responses, Daniels failed to suppress Hrebal's payment history for the

---

[8]     Daniels has since left the company. (*See* McNeil Dep. II at 77.)

period of time between the bankruptcy discharge in October 2015 and the current date. (*Id.*) Thus, based on this Equifax credit report, Hrebal appeared that he had been one payment late for several months, rather than only one payment late as of the current month. According to McNeil, "this was, comparing it to all the other ACDVs, done incorrectly." (McNeil Dep. II at 82.) Daniels also did not mark Hrebal's delinquency as disputed. (*See* Watts Dep. at 134.)

The Court pauses to note that, in responding to Hrebal's CRA disputes, it does not appear that anyone at Seterus, including Watts, understood at the time that the erroneous CitiMortgage Proof of Claim constituted the root of the parties' confusion. Indeed, McNeil admitted that the company did not uncover the connection between that Proof of Claim and Hrebal's consistently-behind-on-his-payments issue until months into this litigation. (*See* McNeil Dep. I at 40, 45-46; McNeil Dep. II at 116.) Rather, at the time, the Seterus representatives in contact with Hrebal and the CRAs, such as Watts, observed that Hrebal was behind on his mortgage according to Seterus's recent payment history (even after his Chapter 13 discharge), and therefore saw no need to investigate the situation further. (*See, e.g.*, Watts Dep. at 44-45 (stating that, although she has access to a "prior servicer's notes," she did not recall reading those notes in this case, and that it is "not common" to review such notes when handling a credit report dispute); *see also* McNeil Dep. II at 92-94 (explaining that CitiMortgage's servicing notes were made available to Seterus upon the transfer of the loan, but that "nobody is responsible [for] go[ing] through all the loan comments").) Moreover, although Watts had the means to contact somebody in Seterus's "bankruptcy department" to learn more about these prior servicing notes, she did not do so. (*See* Watts Dep. at 44.)

In any event, months later, and following several more phone calls from Hrebal (*see* Watts Dep. at 135-36; Servicing Notes at ECF pp. 123-34), Hrebal and Seterus entered into a loan modification agreement that allowed Hrebal to add the "missing payments" to his loan balance and pay the arrears back over time. (*See* McNeil Aff., Exs. J-K ("Jan. 1, 2017 Seterus Loan Modification"); *accord* Hrebal Dep. at 41-42, 76-77.) As best the Court can tell, Seterus stopped reporting Hrebal as delinquent sometime between February and April 2017. (*See* McNeil Dep. II at 62.)

### C. The Damages Allegedly Incurred by Hrebal As a Result of the Credit Reports

Although the parties eventually resolved this matter, Hrebal argues that Seterus's (allegedly erroneous) credit reporting injured him in the following ways:

First and foremost, Hrebal contends that Seterus's reporting prevented him from receiving a favorable loan modification in April of 2016. Specifically, he points to a declaration from Roger Fisette, a loan officer with Embrace Home Loans ("EHL"). In his declaration, Fisette states that, in March of 2016, "all [the] paperwork was finalized" for Hrebal to receive a government-backed Home Affordable Refinance Program ("HARP") loan from EHL. (*See* Lyons Dec., Ex. G [Doc. No. 44-5] ¶¶ 7-10 ("Roger Fisette Declaration").) Because HARP had "no credit score or bankruptcy waiting period requirement," the loan was ideal for Hrebal. (*Id*. ¶ 6.) Moreover, the loan would have lowered Hrebal's interest rate to 4.375 percent and accordingly saved him around $800 a month in mortgage payments. (*Id*. ¶ 9.) However, "on April 18, 2016, Mr. Hrebal's March 1, 2016 mortgage payment was referenced as late [by 48 days]," and therefore "Embrace Home Loans had no alternative but to deny Mr. Hrebal a refinance loan." (*Id*. ¶¶ 11-14; *see also* Tsai Dec. II, Ex. B [Doc. No.

51] ("April 18, 2016 Payoff Statement") (stating that Hrebal's "next payment" was due "March 1, 2016" and assessing late charges).) Instead, Hrebal had to wait to refinance until March 2017, after he became current on his mortgage with Seterus. "Ultimately," Fisette noted, "the March 17, 2017 loan that Mr. Hrebal was able to successfully close on [was] at an interest rate of 4.625 percent," and therefore only saved him around $300 a month in monthly payments. (Fisette Dec. ¶¶ 15-20; *accord* Hrebal Dep. at 83-84.)[9]

Second, Hrebal asserts that Seterus's reporting caused him to feel embarrassment and shame when he applied for a new job in December 2016. (*See* Hrebal Dep. at 24-25.) Because the job application stated that his putative employer would check his credit score, and because Hrebal feared that his credit report would inhibit his odds of securing the job, Hrebal told his boss "up front" about his impaired credit. (*Id*. at 26.) Although Hrebal received the job (where he works to this day) and none of his colleagues ever referenced his late mortgage payments to him, Hrebal nonetheless felt embarrassed by the whole process. (*Id*. at 24-26.) Hrebal's wife, Christine, confirmed his feelings, noting that, when Hrebal applied for the new job, he constantly asked, "How [am I] supposed to explain the two late payments after being out of bankruptcy for just a year? Would [my] future employer even believe [me]?" (C. Hrebal Dec. ¶ 15.) According to Ms. Hrebal, this stress resulted in "many restless nights." (*Id*.)

---

[9]      Two additional facts are worth noting: First, the credit report Fisette purportedly considered in making this loan decision did not reference any past-due payments to Seterus. (*See* Tsai Dec., Exs. M, O [Doc. No. 37] ("Embrace Home Loans Credit Reports").) Second, in his deposition, Fisette did not describe Seterus's credit reporting as a causal factor behind the loan denial. (*See* Tsai Dec., Ex. N [Doc. No. 37] at 19-25 ("Roger Fisette Deposition").)

Finally, Hrebal contends that, as a general matter, Seterus's reporting caused him a great deal of stress. Although the stress neither manifested in serious physical illness, nor caused Hrebal to miss work, both Hrebal and his wife testified that, during this time period, Hrebal became "short tempered" and "would snap" because "no one would help [him] with the situation." (Hrebal Dep. at 22-23; *see also id*. at 30 (stating that, during this time, he "just didn't feel good . . . [and had] headaches").) Ms. Hrebal confirmed that her husband "became very short tempered with [herself] and the three kids," and that she is "not sure [Hrebal] will ever be the same after everything he has been through over the last eight years." (C. Hrebal Dec. ¶¶ 2, 8.) Moreover, Hrebal expressed deep frustration that Seterus's (alleged) misreporting was happening just months after he had a successfully completed a years-long bankruptcy plan. (*See, e.g.*, C. Hrebal Dec. ¶¶ 17-18 (stating that "it's never easy to make the decision to file for bankruptcy," but "we never expected to finalize our bankruptcy and then [have to] fight to fix [Hrebal's] credit report").)[10]

### D. Procedural History

On May 31, 2017, Hrebal filed this FCRA suit against Seterus. In his complaint, Hrebal sought actual, statutory, and punitive damages for willful and negligent non-compliance with the FCRA, as well as attorney's fees and costs. (*See* Compl. Prayer for Relief

---

[10] Hrebal's summary judgment motion also included a declaration from his friend, Richard Scoles, in which Scoles confirmed that Seterus's credit reporting had a visible effect on Hrebal. (*See* Lyons Dec., Ex. H [Doc. No. 44-6] ("Richard Scoles Declaration").) However, because Hrebal did not properly disclose this witness pursuant to Fed. R. Civ. P. 26, Hrebal's counsel withdrew the declaration at the motion hearing. (*See* Aug. 22, 2018 Hr'g Tr. at 36; *see also* Def.'s Reply Br. [Doc. No. 55] at 14 (requesting this withdrawal).)

(citing 15 U.S.C. §§ 1681n and 1681*o*).) Seterus answered on July 21, 2017, and the parties

proceeded through discovery. On July 11, 2018, both parties moved for summary judgment,

accompanied by a complete set of briefing. (*See* Def.'s Mem. in Support of Summ. J. [Doc.

No. 35] ("Def.'s Br."); Pl.'s Mem. in Opp. to Def.'s Summ. J. Mot. [Doc. No. 52] ("Pl.'s Opp.

Br."); Def.'s Reply Br. [Doc. No. 55]; Pl.'s Mem. in Support of Partial Summ. J. [Doc. No.

43] ("Pl.'s Br."); Def.'s Mem. in Opp. to Pl.'s Summ. J. Mot. [Doc. No. 50]; Pl.'s Reply Br.

[Doc. No. 54].) The Court heard oral argument on August 22, 2018.

## B. DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). In

considering a summary judgment motion, "the deciding court views the evidence, and makes

all reasonable inferences from the evidence, in favor of the nonmoving party." *Landers Auto

Grp. No. One, Inc. v. Cont'l W. Ins. Co.*, 621 F.3d 810, 812 (8th Cir. 2010). Although a

nonmovant "cannot rest on [his] pleadings alone," *Beyer v. Firstar Bank, N.A.*, 447 F.3d 1106,

1108 (8th Cir. 2006), "[s]ummary judgment must be denied if on the record before it the court

determines that there will be sufficient evidence for a jury to return a verdict in favor of the

nonmoving party," *Landers Auto Grp.*, 621 F.3d at 812.

## A. The Threshold Question of Bankruptcy Law

Before proceeding to the merits of Hrebal's FCRA claim, the Court first acknowledges

that the parties dispute a threshold question of bankruptcy law. That is, they dispute whether

the Bankruptcy Code entitled Seterus to enforce the two missing *pre-petition* mortgage

payments *after* Hrebal's discharge, when neither Seterus nor its predecessor, CitiMortgage,

included those two payments in their Proof of Claim, or otherwise challenged Hrebal's final, confirmed bankruptcy plan setting his pre-petition arrears at $6,152.37. (*Compare, e.g.*, Pl.'s Br. at 19 (arguing that Hrebal's discharge order "completely absolved [him] of any old arrearages or liability outside of what was listed in the proof of claim," and that Seterus could not "seek collection of [that] discharged debt by mischaracterizing at as occurring after the bankruptcy was completed") *with* Def.'s Opp. Br. at 29 (noting that "'a secured creditor's claim for mortgage arrearage survives the confirmed plan to the extent that it is not satisfied in full by payments under the plan,'" and that, "because the bankruptcy did not discharge [Hrebal's] personal liability for the [home mortgage] debt, [he] remained liable for the two payments after bankruptcy") (quoting *In re Bateman*, 331 F.3d 821, 822 (11th Cir. 2003).) In the parties' view, this issue matters because, on the one hand, if the law did allow Seterus to declare Hrebal "two payments behind" as he exited bankruptcy, the company's credit reporting would have been at least technically accurate. On the other hand, if the law did not allow Seterus to do that, and Seterus could have uncovered its error upon investigation, its credit reporting would have been inaccurate, or, at best, misleading.

As explained below, though, the Court can resolve this FCRA case without opining on that complex question of bankruptcy law, which, as best the Court can tell, can be answered in favor of either party. *Compare, e.g.*, *In re Smith*, 575 B.R. 869, 879 (Bankr. W.D. Ark. 2017) (ruling that a lender could not collect on its lien after the homeowner's bankruptcy discharge because, even though the Chapter 13 Plan understated the actual principal and arrearage owed the lender, "the Creditor was afforded notice of the [inaccurate] modification of the plan and failed to object," and therefore "the terms of the confirmed plan 'bind' both

the debtor and Creditor despite the improper treatment [of the mortgage debt]"); *In re Alonso*, 525 B.R. 195 (Bankr. D.P.R. 2015) (same); *In re Miller*, No. 99-br-25616 (JAD), 2007 WL 81052 (Bankr. W.D. Pa. 2007) (same) *with In re Bateman*, 331 F.3d at 832-33 (ruling that a lender *could* collect on its lien after a homeowner's bankruptcy discharge because, even though the binding Chapter 13 Plan understated the actual arrearage owed the lender, a "secured claim is unaffected by the Plan and survives the bankruptcy unimpaired," so as to prevent the homeowner from receiving "a windfall"); *In re Davenport*, 544 B.R. 245, 255 (Bankr. D.D.C. 2015) (same); *In re Stiller*, 323 B.R. 199, 215 (Bankr. W.D. Mich. 2005) (same).[11] Indeed, the Court is particularly reluctant to wade into this legal grey area because it is not a Bankruptcy Court, and, as "many courts have held," "Congress intended for bankruptcy judges to determine complex issues of bankruptcy law to the 'greatest extent possible.'" *Peoples Nat. Bank of Mora v. Stucky*, No. 10-cv-4467 (ADM/LIB), 2011 WL 477920, at *1 (D. Minn. Feb. 9, 2011) (quoting *In re Alpern*, 191 B.R. 107, 110 (N.D. Ill. 1995)).

## A. Hrebal's Fair Credit Reporting Act Claim

---

[11]     This divergence seems to arise because the Bankruptcy Code, and subsequent Supreme Court decisions interpreting the Code, pull courts in opposing directions. On the one hand, the Code affords home mortgage lenders special protections in the Chapter 13 context, and states that a home mortgage debt can neither be modified nor discharged in a Chapter 13 proceeding. *See* 11 U.S.C. § 1322(b)(2); 11 U.S.C. § 1328(a)(1); *Nobelman v. Am. Sav. Bank*, 508 U.S. 324 (1993). On the other hand, the Code emphasizes the finality of a confirmed Chapter 13 plan, even if that plan contains a plain legal error. *See* 11 U.S.C. § 1327(a); *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010). Hence, it is not clear how courts should treat arrearages that a mortgage lender is undoubtedly entitled to collect under its contract, but that the lender failed to account for in a debtor's confirmed Chapter 13 plan, especially when the lender had ample notice and opportunity to correct its error.

## 1. The Law

### a. Liability

Over forty years ago, Congress enacted the FCRA "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). To that end, the FCRA regulates not only CRAs, like Experian and Equifax, but also those who "furnish" consumer data to CRAs, like Seterus here. *See* 15 U.S.C. § 1681s-2; *see also Chiang v. Verizon New England Inc.*, 595 F.3d 26, 35 (1st Cir. 2010) (noting that Congress began regulating furnishers under the FCRA in 1996 because of "an identified gap in the FCRA's coverage, whereby even dutiful investigations of consumer disputes by CRAs could be frustrated by furnishers' irresponsible verification of inaccurate information, without legal consequence to the furnishers").

Specifically, the statute requires "furnishers" to "provide accurate information" to CRAs, *see* 15 U.S.C. § 1681s-2(a), and then, if informed by a CRA that a consumer is disputing any information appearing on their credit report, "conduct an investigation with respect to the disputed information," *see id.* § 1681s-2(b). "If an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified," the furnisher must "promptly" "modify," "delete," or "permanently block the reporting of" "that piece of information." *See id.* § 1681s-2(b)(1). If a furnisher fails to discharge its duties under § 1681s-2(b), the consumer may sue the furnisher for money damages. *See Johnson v. Collecto, Inc.*, 127 F. Supp. 3d 1012, 1017 (D. Minn. 2015).[12]

---

[12]     By contrast, only federal or state agencies may enforce a violation of § 1681s-2(a). *See* 15 U.S.C. § 1681s-2(c)(1). The statute therefore requires consumers to notify a CRA

In determining whether a furnisher violated § 1681s-2(b), courts first ask whether the furnisher "conduct[ed] a *reasonable* investigation of their records to determine whether the disputed information can be verified." *Id*. (emphasis in original); *accord Anderson v. EMC Mortg. Corp.*, 631 F.3d 905, 908 (8th Cir. 2011). Although the Eighth Circuit has not had an opportunity to expound on this standard, circuit courts across the country have generally held that, though a "reasonable investigation" will "vary depending on the circumstances of the case . . . and on the quality of the documentation available to the furnisher," *Hinkle v. Midland Credit Mgm't, Inc.*, 827 F.3d 1295, 1301-02 (11th Cir. 2016), it must be "a fairly searching inquiry, or at least something more than a mere cursory review," *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616 (6th Cir. 2012); *accord Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014); *Chiang*, 595 F.3d at 38; *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009); *Johnson v. MBNA Am. Bank, N.A.*, 357 F.3d 426, 430 (4th Cir. 2004). For instance, "[w]hen a furnisher has access to dispute-related information beyond the information provided by the CRA, it will often be reasonable for the furnisher to review that additional information and conduct its investigation accordingly." *Hinkle*, 827 F.3d at 1306 (citing *Gorman*, 584 F.3d at 1157 n.11). Multiple courts in this District have adopted an analogous understanding of "reasonableness," and have further held that "generally, questions regarding the reasonableness of an investigation are best for a jury to determine." *Meyer v.*

---

of a dispute (who in turn must notify the furnisher of the dispute, who in turn must investigate the dispute) before suing the furnisher under § 1681s-2(b). *See, e.g.*, *Thulin v. EMC Mortg. Corp.*, No. 06-cv-3514 (RHK/JSM), 2007 WL 3-37353, at *6 (D. Minn. Oct. 16, 2007) (rejecting § 1681s-2(b) claim because the consumer "admitted that he never advised the [CRAs] that he was disputing [the furnisher's] reports of late payments"). There is no dispute that Hrebal followed the proper procedure here.

*F.I.A. Card Serv., N.A.*, 780 F. Supp. 2d 879, 883 (D. Minn. 2011); *see also Johnson*, 127 F.

Supp. 3d at 1017-18; *Edeh v. Midland Credit Mgm't, Inc.*, 748 F. Supp. 2d 1030, 1039 (D.

Minn. 2010); *Malm v. Household Bank (SB), N.A.*, No. 03-cv-4340 (ADM/AJB), 2004 WL

1559370, at *4 (D. Minn. July 7, 2004).

That said, regardless of an investigation's reasonableness, a furnisher may be entitled

to summary judgment if the consumer fails "to show *actual inaccuracies* that a furnisher's

objectively reasonable investigation would have been able to discover." *Edeh*, 748 F. Supp.

2d at 1039 (emphasis added) (citing *Chiang*, 595 F.3d at 37-38). Although the Eighth Circuit

has not had the opportunity to expound on this standard either, multiple circuit courts have

held that, "even if [credit] information is technically correct, it may nonetheless be inaccurate

if, through omission, it 'creates a materially misleading impression.'" *Seamans*, 744 F.3d at

865 (quoting *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir.

2008)); *accord Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1186 (10th Cir. 2013);

*Boggio*, 696 F.3d at 617; *Gorman*, 584 F.3d at 1163. Importantly, several circuit courts have

built upon this general standard by specifically holding that a furnisher may "create a

materially misleading impression" when, "having received notice of a consumer's potentially

meritorious dispute, [the] furnisher subsequently fails to report that the claim is disputed." *Id.*

at 867; *accord Llewellyn*, 711 F.3d at 1186; *Gorman*, 584 F.3d at 1162-64; *Saunders*, 526

F.3d at 149-50. This is so because "fail[ing] to report a bona fide dispute" "could materially

alter how the reported debt is understood." *Gorman*, 584 F.3d at 1163. For example, "if a

consumer has a meritorious dispute . . . the consumer's failure to pay the debt does not reflect

financial irresponsibility." *Saunders*, 526 F.3d at 150; *but cf. Gorman*, 584 F.3d at 1163

(noting that it is generally not misleading for a furnisher to "fail[] to report a *meritless* dispute") (emphasis added).[13] As with the reasonableness of an investigation, whether "technically accurate information" was "materially misleading" "is generally a question to be submitted to the jury." *Seamans*, 744 F.3d at 865 (citing *Gorman*, 584 F.3d at 1163).

### b. Scienter and Damages

If a consumer demonstrates that a furnisher breached its duties under § 1681s-2(b), the FCRA offers them two ways to secure damages. First, a consumer may prove that a furnisher's breach was "willful," and thereby avoid having to prove actual damages. *See* 15 U.S.C. § 1681n (entitling prevailing consumer to statutory and/or punitive damages for "willful" violations). Under the FCRA, "willfulness" includes "reckless" actions "entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco*, 551 U.S. at 68-69. "[I]nconsistent responses in the face of numerous requests from [the consumer] and inquiries from the CRAs" may evince a furnisher's "willfulness in failing to comply with the FCRA." *Schaffhausen v. Bank of America, N.A.*, 393 F. Supp. 2d 853, 859 (D. Minn. 2004). A company's adoption of a blanket ban on reporting debts as disputed may also constitute evidence of "willful" or "reckless" non-compliance with § 1681s-2(b). *See, e.g.*, *Seamans*, 744 F.3d at 868; *Saunders*, 526 F.3d at 151.

---

[13]     Furnishers also have a freestanding duty under 15 U.S.C. § 1681s-2(a)(3) to inform the CRAs that credit information is disputed. As noted above, consumers may not enforce provisions of sub-section (a) directly. (*See supra* at n.12.) However, "the fact that a furnisher is affirmatively obligated to flag an account as disputed under § 1681s-2(a) does not undermine the conclusion that a *failure* to flag the account as disputed also constitutes a material inaccuracy under § 1681s-2(b)." *Seamans*, 744 F.3d at 867.

However, if a consumer can only show that a furnisher's breach was "negligent," they must also prove actual damages. *See* 15 U.S.C. § 1681*o*.[14] "A denial of credit or higher interest rates resulting from a . . . credit report can constitute actual damages under the FCRA." *Edeh v. Equifax Info. Servs.*, 974 F. Supp. 2d 1220, 1242 (D. Minn. 2013). "[M]ental pain and anxiety can [also] constitute actual damages" under the FCRA, so long as conclusory allegations are "supported by competent evidence of 'genuine injury,' which 'may be evidenced by one's conduct and observed by others." *Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824, 828 (8th Cir. 2013) (quoting *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978)). In either case, it is essential that a consumer shows that they "suffered damages *as a result of* the inaccurate information." *Edeh*, 974 F. Supp. 2d at 1242 (emphasis added) (citing *Ruffin-Thompkins v. Experian Info. Sol., Inc.*, 422 F.3d 603, 608 (7th Cir. 2005)).

## 2. Analysis

The parties dispute one issue with respect to liability, and two issues with respect to scienter and damages. First, the parties dispute whether evidence exists from which a reasonable juror could find that Seterus breached its duties under the FCRA to reasonably investigate Hrebal's credit dispute, and then correct any "inaccurate" or "materially misleading" information following that investigation. Second, assuming the first issue is resolved in Hrebal's favor, the parties dispute whether evidence exists from which a

---

[14]     Of course, a consumer may receive actual damages stemming from a "willful" violation of the FCRA, too. *See* 15 U.S.C. § 1681n(a)(1)(A). The issue is that, for a negligence claim, a consumer is *only* entitled to actual damages, and hence must demonstrate a "dispute of material fact" regarding such damages to advance their FCRA claim past the summary judgment stage. *See Johnson*, 127 F. Supp. 3d at 1017.

reasonable juror could find that Seterus "willfully" or "recklessly" breached its statutory duties. Third, and again assuming the first issue is resolved in Hrebal's favor, the parties dispute whether evidence exists from which a reasonable juror could find that Hrebal suffered actual damages, including emotional distress, as a result of Seterus's breach. The Court will address each dispute in turn.

### a. Liability

Although Hrebal's complaint contains only one FCRA count, he essentially advances two alternative theories of liability. First, Hrebal argues that Seterus breached its duties under § 1682s-2(b) because, in responding to the three ACDVs, Seterus failed to uncover that Hrebal was not, in fact, behind on his mortgage, and accordingly failed to remove the delinquency from his credit report. (*See* Pl.'s Opp. Br. at 2-11.) This theory is inextricably linked to the bankruptcy issue detailed above, in that Seterus could only have definitively determined that Hrebal was not behind on his mortgage if the bankruptcy discharge barred Seterus from enforcing the missing pre-petition arrears. Second, however, Hrebal contends that, regardless of the merits of the bankruptcy law question, Seterus breached its duties under § 1682s-2(b) because, in responding to the three ACDVs, Seterus failed to uncover that Hrebal's dispute was bona fide, and accordingly failed to at least mark the delinquency as "disputed." (*See* Pl.'s Opp. Br. at 17; *see also* Hr'g Tr. at 36 (describing the second theory as viable "regardless of what happens [with] the bankruptcy dispute").)

The Court finds that it need not rule on the first theory of liability (and thereby resolve the underlying question of bankruptcy law) because the record plainly demonstrates that

Hrebal is entitled to a jury trial on his second theory of liability. Consider the following undisputed facts, drawn from Section I, *supra*:

*First*, Hrebal's only missing payments from the bankruptcy filing through spring of 2016 were the two pre-petition payments from August and September 2010, which CitiMortgage failed to include in its Proof of Claim. *Second*, neither Seterus nor CitiMortgage ever amended this Proof of Claim, and, after Hrebal successfully completed his bankruptcy plan in October 2015, the Bankruptcy Court discharged Hrebal's remaining debts. *Third*, Watts and Daniels had access to the servicing notes and payment history that elucidate the prior two facts (and hence would have explained why Hrebal's "delinquency" made no sense to him), but, in investigating Hrebal's three ACDVs, neither person looked past their recent payment history screen. (Indeed, no one at the company deduced the source of Hrebal's well-founded confusion until months into this litigation.) *Fourth*, Watts and Daniels also had access to a specialized bankruptcy department that could have helped explain the prior servicer notes, but, in investigating Hrebal's three ACDVs, neither person contacted this department. *Fifth*, following their "investigations," Watts and Daniels issued a series of inconsistent responses to the CRAs, all of which gave the impression (one way or another) that Hrebal had fallen behind on his mortgage immediately after exiting bankruptcy. *Sixth*, and perhaps most importantly, Watts and Daniels could have marked Hrebal's mortgage delinquency as "disputed," but never did, despite receiving three separate ACDVs about Hrebal's dispute, as well as multiple phone calls.

On these facts, a reasonable juror could find that Seterus's investigation(s) into Hrebal's dispute(s) was nothing more than a "mere cursory review," *Boggio*, 696 F.3d at 616,

and that a reasonable investigation should have resulted in Seterus (1) determining that Hrebal had a bona fide dispute with respect to his mortgage delinquency, and (2) reporting the delinquency as disputed on its ACDV responses, through either their "CCC" or "XO" codes. (*See supra* at 9.) In other words, a reasonable juror may find that simply re-affirming Hrebal's delinquency, without *any* mention of a dispute, rendered Seterus's credit reporting "inaccurate" because "through omission," "it create[d] a materially misleading impression" that Hrebal was more financially irresponsible than he actually was. *Seamans*, 744 F.3d at 865. Indeed, a reasonable juror might find this omission especially "misleading" because Hrebal had just successfully completed a (years-long) Chapter 13 bankruptcy plan and received a discharge, and had not missed a mortgage payment in over five years.[15]

In response, Seterus does not appear to defend the substantive reasonableness of its investigation. *Cf. Meyer*, 780 F. Supp. 2d at 883 ("Generally, questions regarding the reasonableness of an investigation are best for a jury to determine."). Rather, Seterus seems to argue that, regardless of whether Watts and Daniels should have probed deeper into Hrebal's record to discover the root of his "missing payments," Seterus cannot be held liable under the FCRA because (1) the information it reported was accurate (*see* Def.'s Br. at 4-6), and (2) even if the information it reported was inaccurate (because bankruptcy law barred it

---

[15]    Completing a Chapter 13 bankruptcy plan and receiving a discharge is no minor feat. *See* Paul Kiel, *Bankruptcy: What's the Difference Between Chapter 7 and Chapter 13*, ProPublica (Sept. 27, 2017 8:00 AM), *available at* https://www.propublica.org/article/bankruptcy-difference-filing-chapter-7-13-success (noting that, between 2008 and 2010, only "41 percent of debtors who filed under Chapter 13 received a discharge of their debts").

from enforcing the uncured arrears), Seterus should not have to report a dispute to the CRAs if that dispute is legal, as opposed to factual. (*See id*. at 8-9). Neither argument is availing.

As to the first point, Seterus essentially relies on the bankruptcy argument detailed above. Namely, that, because bankruptcy law purportedly entitled Seterus to enforce the uncured pre-petition arrears against Hrebal, and because Hrebal never paid those arrears, "the undisputed material evidence demonstrates that Seterus reported accurate information in response to [the] ACDVs." (Def.'s Opp. Br. at 30.) The Court disagrees. For one, because the bankruptcy case law does not definitively demonstrate that Seterus was entitled to enforce the uncured arrears, this case is a far cry from those cited by Seterus, where a court found a furnisher's report of a debt accurate as a matter of law. *See, e.g.*, *Chiang*, 595 F.3d at 40 (granting furnisher summary judgment where consumer's only evidence of inaccuracies were his own, uncorroborated affidavits "that he told [the furnisher] he disputed various bills"); *Edeh*, 748 F. Supp. 2d at 1039-40 (granting furnisher summary judgment when consumer "admit[ted] that he owe[d] the full amount of the debt that [the furnisher] verified to the CRAs"). Moreover, even if Seterus's reporting was "technically correct" under some reading of the bankruptcy law, a reasonable juror could nonetheless determine that failing to even mark Hrebal's delinquency as "disputed" constituted a materially misleading "inaccuracy by omission." *See Seamans*, 744 F.3d at 865.

With respect to the second argument, Seterus cites the First Circuit's *Chiang* case for the proposition that, "[e]ven if [Hrebal] could argue that his bankruptcy somehow prevents Seterus from enforcing the two payments that Citi omitted from its [Proof of Claim], [Hrebal's] FCRA claim would still fail because the mere existence of a disputed legal question

does not render credit reporting inaccurate or incomplete." (Def.'s Br. at 8; *see Chiang*, 595 F.3d at 38 (noting that "a plaintiff's required showing is *factual* inaccuracy, rather than the existence of disputed legal questions," because "furnishers are neither qualified nor obligated to resolve matters that turn on questions that can only be resolved by a court of law").) In other words, Seterus seems to argue, because Watts and Daniels are not bankruptcy lawyers, the Court should not fault them for failing to resolve Hrebal's dispute. Although this argument has some force, the Court finds it inapposite here, for two reasons.

First, the Court is skeptical that this portion of *Chiang* was correctly decided. For one, the First Circuit's strict emphasis on "*factual* inaccuracy" conflicts with the prevailing interpretation of § 1682s-2(b), *i.e.*, that, "even if [credit] information is technically correct, it may nonetheless be inaccurate if, through omission, it creates a materially misleading impression." *Seamans*, 744 F.3d at 865; *see also supra* at 20 (noting that four other circuit courts have adopted this standard). These two standards are arguably incompatible because the reporting of an existing debt (without marking it disputed) may be "technically correct," in the factual sense, but nonetheless "materially misleading" if the consumer has a "potentially meritorious" dispute over the enforceability of the debt. *Seamans*, 744 F.3d at 867; *accord Horsch v. Wells Fargo Home Mortg.*, 94 F. Supp. 3d 665, 676 (E.D. Pa. 2014) (acknowledging this incompatibility and declining to apply *Chiang*). What is more, *Chiang* cited only one case in support of this "factual dispute versus legal dispute" distinction, and that case involved the investigatory duties of <u>CRAs</u>. *See Chiang*, 595 F.3d at 38 (citing *DeAndrade v. TransUnion LLC*, 523 F.3d 61, 67 (1st Cir. 2008)). But, when it comes to a potential legal dispute over a debt, a furnisher "stands in a far better position to make a

thorough investigation . . . than the CRA does on reinvestigation," because "the CRA is a third party, lacking any direct relationship with the consumer." *Gorman*, 584 F.3d at 1156; *see also Saunders*, 526 F.3d at 150 (observing that "[c]laims brought against CRAs based on a legal dispute of an underlying debt raise concerns about 'collateral attacks' because the creditor is not a party to the suit, while claims against furnishers . . . do not raise this consideration because the furnisher *is* the creditor on the underlying debt"). Because of this distinction, it is perhaps unsurprising that no other circuit court has followed *Chiang*'s lead in the furnisher context, despite ample opportunity to do so.[16]

Second, even if this Court were to follow *Chiang*, marking Hrebal's delinquency as disputed in no way required Watts or Daniels (or anyone at Seterus) to "resolve . . . [a] question[] that [could] only be resolved by a court of law." *Chiang*, 595 F.3d at 38. Of course, it is true that Seterus had to make some threshold determination that Hrebal's dispute was "bona fide," *Gorman*, 584 F.3d at 1163, or "potentially meritorious," *Seamans*, 744 F.3d at 867, before the FCRA obligated it to confirm that Hrebal's delinquency was disputed. However, this inquiry did not require Watts or Daniels to delve into the annals of bankruptcy law; it simply required them to undertake a "searching inquiry" of records that were readily available to them, *Boggio*, 696 F.3d at 616, determine that Hrebal's only missing payments were from five years prior, before his bankruptcy, and then acknowledge that Hrebal might have a legitimate gripe with Seterus reporting his account as delinquent in 2016, "without *any*

---

[16]     Notably, all of the other circuit court decisions Seterus cites in support of this "factual dispute versus legal dispute" distinction involve CRAs, not furnishers. (*See* Def.'s Br. at 8-9.)

mention of a dispute." *Saunders*, 526 F.3d at 150. *Levine v. JPMorgan Chase & Co*., 46 F. Supp. 3d 871 (E.D. Wis. 2014), offers a useful comparison. There, the District Court found that a furnisher did not need to report a delinquency as disputed because the consumer's dispute was "completely meritless," if not "disingenuous"; the consumer's only justification for missing his payments was his mortgage lender's purported failure to mail him a paper copy of his mortgage statement. *Id*. at 875-76. Suffice it to say, Hrebal's dispute with Seterus is a far cry from that case.

For these reasons, a genuine dispute of material fact exists as to whether Seterus breached its duties under 15 U.S.C. § 1682s-2(b).[17]

### b. Scienter and Damages

### i. Willfulness

Seterus also argues that no reasonable juror could find that it "willfully" or "recklessly" violated the FCRA "because Seterus has policies and procedures in place to ensure compliance with FCRA requirements," and therefore "any violation of § 1681s-2(b) was unintentional and deviated from Seterus's standard procedures." (Def.'s Br. at 16.) However, two facts convince the Court that a reasonable juror could find otherwise.

---

[17] The Court briefly acknowledges that Hrebal moved for summary judgment on this issue as well. (*See* Pl.'s Br. at 12.) However, Hrebal did not cite any cases in which a court has granted summary judgment to a consumer-plaintiff on the reasonableness of a furnisher's investigation, and the Court cannot find any such cases either. Indeed, Hrebal's counsel did not press this position at oral argument. (*See* Hr'g Tr. at 35-36.) As such, the Court will follow the general practice of its sister courts and send this issue to the jury.

29

First, Seterus's inconsistent responses to Hrebal's inquiries from 2014 through 2016 cast into doubt whether Seterus's (arguable) non-compliance with the FCRA was entirely "unintentional." (Def.'s Br. at 16.) For instance, when Hrebal initially called Seterus in 2014 about his payments, Seterus's representative supposedly informed him that he was "current," despite the fact that Seterus's internal payment records listed him as behind at this time. (*See supra* at 4-5 and n.2.) However, when Hrebal called again after seeing the delinquency on his credit report, in spring of 2016, Seterus informed him that he *was* delinquent, despite the fact that Hrebal had not missed a mortgage payment in the months between the two calls. (*See id.* at 7-8.) As a fellow judge of this District has held before, "inconsistent responses in the face of numerous requests from [the consumer] and inquiries from the CRAs" may evince a furnisher's "willfulness in failing to comply with the FCRA." *Schaffhausen*, 393 F. Supp. 2d at 859. The Court finds likewise here.

Second, and more importantly, the Court finds that Seterus's blanket policy against reporting debts as disputed also calls into question Seterus's culpability. At her deposition, Ms. Watts testified that Seterus does not ever inform CRAs that a debt is "disputed" in response to an ACDV, because "the [CRAs] have already been notified on their end that the consumer is disputing something." (Watts Dep. at 134, 149-50.)[18] However, at least three courts, including two federal circuit courts, have found that a virtually identical "blanket policy" against "marking accounts as disputed" may evince a "willful" or "reckless"

---

[18]     Although Ms. Watts was testifying as a factual witness, Hrebal's counsel explained at the motion hearing that Seterus "put up" Ms. Watts as "the person who knows the most about ACDVs and about reporting." (*See* Hr'g Tr. at 32.) Seterus's counsel did not dispute this characterization.

disregard for compliance with the FCRA. *See Seamans*, 744 F.3d at 868-69; *Saunders*, 526

150-51; *Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599, 610 (E.D. Pa. 2012); *cf. Boggio*,

696 F.3d at 620 (finding that a policy "prohibit[ing] employees from performing anything

more than a cursory confirmation of a [consumer's] status before reporting back to a CRA"

potentially "demonstrated a reckless disregard for the § 1681s-2(b) requirements").

Moreover, *Seamans* and *Saunders* explicitly rejected Watts's proffered rationale for the

"no dispute" policy. In *Seamans*, for instance, the Third Circuit stated that reporting a debt

as "disputed," in response to an ACDV (which itself constitutes a notice of dispute), serves

"two purposes":

> [F]irst, the furnisher, not the CRA, is in the best position to determine
> whether the dispute is bona fide, and thus the furnisher's validation of the
> dispute signifies that the dispute is genuine; and second, the furnisher must
> provide notice of the dispute to all CRAs to whom it originally submitted the
> information – not just to the CRA which initially notified the furnisher of the
> dispute.

*Seamans*, 744 F.3d at 867 n.11; *accord Saunders*, 526 F.3d at 150.

The Court finds the reasoning articulated in these decisions persuasive here. Indeed,

the Court finds it notable that *Seamans* and *Saunders* were rendered long before March of

2016, and yet Seterus (a nationwide mortgage servicer) did not appear to modify its

practices in response to these federal circuit court decisions.

For these reasons, a genuine dispute of material fact exists as to whether Seterus "willfully" or "recklessly" violated the FCRA, such that Hrebal may be entitled to statutory and/or punitive damages.[19]

### ii. Actual Damages

Finally, Seterus argues that, to the extent Hrebal is seeking actual damages (which he may collect under either a "willfulness" theory or a "negligence" theory), none of his alleged damages are cognizable as a matter of law.

First, Seterus argues that Embrace Home Loans ("EHL") "did not deny credit because of Seterus's alleged credit reporting." (Def.'s Br. at 12.) In particular, Seterus notes that the HARP loan for which Hrebal was applying had no credit score requirement (*see* Fisette Dec. ¶ 6), and that, in any event, the April 8, 2016 credit report upon which EHL purportedly relied showed Hrebal's mortgage as "current with no past due payments." (Def.'s Reply Br. at 12.) In response, Hrebal argues that the April 8, 2016 credit report is irrelevant because "the loan was denied based on the broker's subsequent review of [Hrebal's] credit that occurred prior to closing." (Pl.'s Opp. Br. at 19.) Hrebal does not provide any record citation in support of this contention.

On this point, the Court agrees with Seterus. Even viewing the record in the light most favorable to Hrebal, there is no evidence from which a reasonable juror could conclude that EHL denied Hrebal a HARP loan "as a result of" Seterus's credit reporting. *Edeh*, 974 F.

---

[19] For essentially the same reasons stated in note 17, *supra*, the Court also declines to grant summary judgment to Hrebal on the question of "willfulness."

Supp. 2d at 1242. Roger Fisette, the EHL loan officer who denied the loan, specifically stated in his declaration that an April 18, 2016 pay-off statement, which "referenced" Hrebal's loan as "48 days late," caused the loan denial, not the delinquent credit reporting. (*See supra* at 12-13.) At his deposition, Fisette did not testify to the contrary. (*Id*. at n.9) This makes sense, as Fisette's declaration also noted that HARP loans have "no credit score requirement." (Fisette Dec. ¶ 6.) Moreover, to the extent EHL considered Hrebal's credit score, the record shows that (for unclear reasons) the relevant credit report did not list Hrebal as delinquent on his mortgage. (*See supra* at n.9.)

Of course, as a matter of bankruptcy law, Seterus may have acted wrongfully in declaring Hrebal "behind" on his mortgage solely as a result of the missing pre-petition arrears. But malfeasance is only actionable through the FCRA if the consumer can connect their damages to a credit report. Because Hrebal did not do so with respect to the EHL loan, Seterus is entitled to summary judgment on this issue. *Accord Dao v. Cellco P'ship*, No. 14-cv-1219 (JRT/BRT), 2015 WL 7572304, at *3-4 (D. Minn. Nov. 24, 2015) (granting furnisher summary judgment on economic damages where the consumer failed to "connect" the furnisher's delinquency reporting to a third party lender's decision to deny mortgage refinancing).

Second, Seterus argues that Hrebal's claimed "emotional distress" damages are not cognizable because (a) his distress "stem[med] solely from foreclosure notices that he received and stress he felt about potentially his losing his home in foreclosure," rather than from Seterus's credit reporting, and (b) neither Hrebal's deposition nor his wife's declaration present evidence of a sufficiently "genuine injury." (Def.'s Reply Br. at 13.) At oral argument,

Seterus's counsel also rejected the idea that Seterus's failure to "check a box" (marking Hrebal's delinquency as disputed) injured Hrebal. (Hr'g Tr. at 46.) Hrebal ripostes by noting that both Hrebal and his wife "provided specific, detailed testimony that [Seterus's] actions caused [Hrebal] to suffer emotional distress and mental anguish, which manifested in sleep, anxiety, and fear of foreclosure." (Pl.'s Opp. Br. at 20.) Because of this, Hrebal contends, "a genuine issue of material fact exists as to the cause and extent of [Hrebal's] damages." (*Id.*)

The Court declines to grant Seterus summary judgment on this issue, for a few reasons. For one, when one views the record in the light most favorable to Hrebal, it becomes clear that a fear of foreclosure was not the "sole" driver of Hrebal's anxiety. (Def.'s Reply Br. at 13.) Rather, it was simply an additional cause of stress to Hrebal, on top of Seterus's repeated refusals to acknowledge his (legitimate) dispute with their credit reporting. *See Llewellyn*, 711 F.3d at 1183 (denying motion for summary judgment on emotional damages and noting that emotional damages in an FCRA case are "no less reasonable simply because [the plaintiff] was . . . experienc[ing] other stressful life events (including several foreclosures) during the same time period").

What is more, Hrebal supports his emotional distress claim with "competent evidence of genuine injury," which was "evidenced by [Hrebal's] conduct and observed by others." *Taylor*, 710 F.3d at 828. In *Taylor*, the Eighth Circuit found that a consumer failed to meet this requirement because she "offered no reasonable detail about the nature and extent of her alleged emotional distress," which consisted of a "brief episode of frustration and unhappiness." *Id*. at 829. Specifically, the consumer was purportedly "injured" when she met with a Housing Authority employee and discovered that a credit report mistakenly included

a criminal history for her. *Id.* However, "the matter was resolved within five to ten minutes, and the Housing Authority approved the [consumer's] application for assistance on the same day." *Id.* Here, by contrast, Hrebal testified about a months-long period of stress and anxiety, where he frequently "snapped" from a "short temper," as well as faced embarrassment at a job interview, all because "no one would help [him] with [his] situation." (Hrebal Dep. at 22-23, 27-28.) Importantly, Hrebal's wife corroborated her husband's testimony in a 19-paragraph declaration. In her declaration, Ms. Hrebal stated that her husband "became very short tempered with [herself] and the three kids," and that she is "not sure [Hrebal] will ever be the same after everything he has been through over the last eight years." (C. Hrebal Dec. ¶¶ 2, 8.) Taken together, this testimony is sufficient to warrant a jury trial on emotional damages. *Accord Johnson*, 127 F. Supp. 3d at 1020 (denying summary judgment on emotional damages where consumer testified that he suffered from "inability to sleep" and "anxiety," "for something more than a 'brief' period, as a result of [the furnisher's] conduct," which his daughter corroborated through a declaration); *Graham v. CSC Credit Servs., Inc.*, 306 F. Supp. 2d 873, 880 (D. Minn. 2004) (denying summary judgment on similar facts); *see also Meyer*, 780 F. Supp. 2d at 885 (denying summary judgment on similar facts, while still expressing "skeptic[ism] about this portion of [the consumer's] claim").

Finally, although the Court acknowledges that neither Hrebal nor his wife explicitly testified that Seterus's failure to mark Hrebal's delinquency as disputed injured Hrebal, the Court finds that, viewing the record as a whole, a reasonable juror could nonetheless infer that Seterus's failure to even acknowledge that Hrebal had a legitimate dispute over the delinquency reporting caused Hrebal some modicum of emotional distress. For instance, if

Hrebal's employer could have seen that Hrebal was disputing the delinquency, it likely would have made Hrebal less stressed about applying for a new job. (*See, e.g.*, C. Hrebal Dec. ¶ 15 (noting that Hrebal questioned whether his "future employer would even believe him" when he tried to "explain the two late payments after being out of bankruptcy for just a year").)

For these reasons, the Court finds that, although there is no genuine dispute of material fact as to whether Seterus's credit reporting caused EHL to deny Hrebal a loan modification (it did not), there is a genuine dispute of material fact as to whether Seterus's credit reporting caused Hrebal emotional distress.

## C. CONCLUSION

This matter is set for trial on Monday, May 6, 2019. A pretrial order will be issued forthwith. In advance of trial, the parties must participate in a final settlement conference at a time convenient for both the parties and the Magistrate Judge.

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Seterus's Motion for Summary Judgment [Doc. No. 33] is **GRANTED IN PART AND DENIED IN PART**; and

2. Hrebal's Motion for Partial Summary Judgment [Doc. No. 41] is **DENIED**.

Dated:  January 25, 2019                                     s/Susan Richard Nelson
                                                            SUSAN RICHARD NELSON
                                                            United States District Judge